11 LOLLEY, J.,
dissenting.
I respectfully dissent from the ruling of the majority concerning the issue(s) of negligence/gross negligence on the part of Children’s Protective Services (CPS) and the agents/employees of that agency.
A review of the record of this case leads me to conclude that the actions and inac-tions of the offieers/agents of CPS had a direct effect and constituted a causal link to the murder of Haley Oliveaux. Therefore, I am of the opinion that the outlined qualified immunities contained in Articles 611 and 612 of the Louisiana Children’s Code and the provisions of R.S. 9:2798.1 are not applicable to the defendants in this matter and that these issues should have been presented to the civil jury trying this matter for valid consideration.
The matter before the trial court jury and the matter presently before this court is one concerning extremely serious issues of child abuse. Indeed the issues were and are so serious that they resulted in the murder of the child. The record clearly reflects that on the date of November 29, 1993, the child Haley Oliveaux, age 28 months, was brought to the offices of Dr. Russell Bulloch, a pediatrician then practicing in Monroe, Louisiana. Haley was brought to the office by one Jimmy Duncan, the live-in boy friend of Haley’s mother. Duncan brought the child to the office because the mother was working at the time. Upon examination it was discovered that the child has a swollen scalp and forehead. Dr. Bulloch, after conducting the examination, immediately referred the child to the St. Francis Medical Center where she was placed into the PICU. As part of the treatment | ¡.process a CT Scan was done on the child wherein it was discovered that she had skull fractures on three parts of her skull and a subdural hematoma. At the trial of this matter several physicians testified that injuries this serious could not have happened in the manner presented by Jimmy Duncan. Skull fractures of these types are classically consistent with Shaken Infant Syndrome. The PICU staff set forth with a treatment plan at that time.
The child was hospitalized for a total of six days. During this time the child’s family grew increasingly suspicious of Duncan’s account of how the injuries occurred. Realizing the obvious friction between the family and Duncan the treating pediatrician at the PICU consulted with a social worker at St. Francis Medical Center about the situation. After this consultation the decision was made to call CPS concerning the situation. CPS was then contacted and requested to intervene in the matter.
CPS was contacted and advised of the situation. Mrs. Griffon was assigned to the initial investigation. She soon went to St. Francis to begin her investigation. It is apparent from the record that Mrs. Griffon was a Crises Intervention Investigator. This is the normal first step in a possible child abuse investigation. It must be noted that CPS investigators are trained professionals and not someone who walked into the office out of the cold winter rain.
After the initial inquiry the case was assigned a Level III status, unspecified abuse, in spite of the serious and obviously suspicious injuries the child has suffered. CPS has claimed that the investigation was treated as a Level I case and the investigation was conducted accordingly. There is Rsimply no evidence in the record which *1280 supports CPS’s claim in this area. Obviously a fractured skull, together with all the other matters going on which were surrounding this injured child should have aroused the suspicion of a trained investigator and the case level should have been raised and a much more intensive investigation conducted.
The families were interviewed and the majority of the complaints were attributed to disputes amongst the family. However, the West Monroe Police Department was contacted and a further investigation was commenced. During this period of time Duncan’s story began to change as to how the events happened. There were also other overt signs that a deeper problem was present than was being told.
As previously stated, Duncan’s story about the incident had begun to change. Additionally, an inspection of the home revealed the chest of drawers in an upright position with the bottom drawer still “cocked” where the child was allegedly climbing up on it when it fell over on top of her. The problem here is that even after falling the chest of drawers was again upright with the drawer in the same position. This should have immediately aroused the investigator’s suspicion as to the validity of the claimed injury. The scene of the event which injured the child had obviously been staged by the perpetrator.
The skull fractures suffered by the child are one of the most overt signs of child abuse and an indicator of Shaken Infant Syndrome. Again, this did not seem to arouse any suspicion of the investigator or CPS.
|4A records request was sent forward by CPS and Mrs. Griffon on December 8, 1993, and was received on December 17, 1993. These records showed that the child had been admitted to the emergency room on three (3) previous occasions with various injuries which were suspicious in nature. This was yet another strong indicator that something was seriously wrong in this case and that further investigation would be warranted. However, this information was not relevant at the time of receipt because CPS had already closed the case as “unfounded” and all complaints were invalidated.
In spite of the, invalidation of the case by CPS there was still time to reopen the matter and further investigate based upon this newly discovered information. It would have been very easy for CPS to have requested an instanter removal order, either verbal or written, from a judge until all of the issues surrounding the matter could have been better resolved. Children have been removed from homes because of abuse or suspected abuse on far less factual situations and overt evidence than presented here. Additionally, at all times CPS has a specially trained and qualified pediatrician in the areas of child abuse and sexual abuse of children who could have been consulted. Again, no such action was taken by CPS or any of its employees/agents. On the date of Saturday, December 18, 1993, Jimmy Duncan murdered Haley Oliveaux.
The record of this matter fully supports appellant’s position that the actions and inactions of CPS and its employees/agents were negligent and grossly negligent in their actions. Therefore the qualified immunities of | sArticles 611 and 612 of the Louisiana Children’s Code and R.S. 9:2798.1 should not have automatically applied to-them.
Unfortunately, a further review of this record clearly shows that this jury was never put into a position to consider these questions.. This was because of the actions of the trial court judge and the jury interrogatories and overall jury charge presented to them. This is especially true when it appears that the trial court judge made a *1281 ruling prior to the beginning of the trial that CPS was entitled to the qualified immunity as a matter of law, without hearing the evidence to be presented.
The jury interrogatories and the jury charge itself were very generic and did nothing to help instruct and guide the jury on the issues of child abuse and the overt signs of it. The majority seems quite satisfied that the jury charge and interrogatories closely track the standard charges outlined in Alton Johnson, Civil Jury Instructions, 18 La. Civ. L. Treatise, Sec. 3013 (West Group, ©2001). This is perhaps true in other civil cases but it is felt that it is not true in the case presently before us.
Child abuse is a dark, murky world that very few persons are ever exposed to. In fact, the average layman rejects this as, thankfully, counter to their standard of living and treatment of their children. It is a world of lies, intimidation, social and economic isolation, and power exhibited by the abuser. Child abuse and domestic abuse are synonymous with each other. All of these elements were present in this case and appellant should have had the opportunity to have this properly presented to the jury at all phases of the case, most especially in the jury interrogatories and jury charge itself.
| fiAdmittedly, every possible equation cannot be addressed in jury interrogatories and a jury charge. However, on an issue as critical as this, the jury should have been able to consider the case with much more specific information from the court than they received.
This is not to say that, even with more detailed information, the jury would have reached a different verdict. However, they should have had the opportunity to evaluate these issues in more detail during their deliberations.
The findings of the jury on these issues and the actions of the trial court were clearly wrong and constitute manifest error. The matter should be reversed on this alone and remanded back to the trial court level for retrial in the issue(s) of negligence/gross negligence on the part of CPS and its employees/agents.